Stacey MOORE *v.* STATE of Arkansas

CA CR 96-865                                    947 S.W.2d 395

Court of Appeals of Arkansas
Divisions I & II
Opinion delivered June 25, 1997

[Petition for rehearing denied August 20, 1997.]

*William M. Howard, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Gil Dudley*, Asst. Att'y Gen., for appellee.

JOHN E. JENNINGS, Judge. On July 30, 1995, Robyn Ross Owens was found shot to death at the Elk's Club in Fordyce, Arkansas. Appellant, Stacey Moore, was subsequently charged with first-degree murder in connection with Owens's death. Moore was also charged with being a felon in possession of a firearm. Moore was found guilty by a Dallas County jury of the lesser included offense of second-degree murder and of felon in possession of a firearm and was sentenced to serve twenty-eight years in the Arkansas Department of Correction. On appeal, Moore argues two points for reversal: (1) the trial court erred in denying appellant's motion for directed verdict; and (2) the trial court erred in allowing the coroner to testify with regard to the bullet wound found on the victim. We find no error and affirm.

A motion for directed verdict is a challenge to the sufficiency of the evidence. *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996). Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Lukach v. State*, 310 Ark. 119, 835 S.W.2d 852 (1992). In determining the sufficiency of the evidence we review the proof in the light most favorable to the appellee, considering only that evidence which tends to support the verdict. *Brown v. State*, 309 Ark. 503, 832 S.W.2d 477 (1992). The fact that evidence is circumstantial does not render it insubstantial. *Payne v. State*, 21 Ark. App. 243, 731 S.W.2d 235 (1997).

In addition, intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances surrounding the crime. *Williams v. State*, 325 Ark. 432, 930 S.W.2d 297 (1996). The jury is allowed to draw upon its own common knowledge and experience to infer intent from the circumstances. *Tiller v. State*, 42 Ark. App. 64, 854 S.W.2d 730 (1993). Because of the difficulty in ascertaining a person's intent, a presumption exists that a person intends the natural and probable consequences of his acts. *Brown v. State*, 54 Ark. App. 44, 924 S.W.2d 251 (1996).

In the case at bar, the State offered testimony from thirteen witnesses. In particular, Ms. Jonell Jenkins, the victim's sister, testified that she had been with her sister all day on July 29, 1995, and during the early morning hours of July 30, 1995. They had just completed a two-week course to become certified nurse's assistants and were celebrating with two other friends, Melody and Stephanie Harris. Jenkins testified that after visiting their cousin, Chris Ross, at his house, they decided to go to the Elk's Lodge. At the Lodge, Jenkins testified that Robyn, Melody, Stephanie, and herself, got a table, sat down, and then danced. Jenkins stated that after Chris Ross, who was also at the Lodge at that time, got into an altercation with Patrick Crain, they decided to leave the Lodge.

Jenkins testified that as they were driving away, they changed their minds, and decided to go back to the Lodge to see their cousin, Ross. When they arrived back at the Lodge, Jenkins stated that appellant and another man named "Pop" were in front of the club arguing. According to Jenkins, Robyn got out of the car and went back into the Lodge. Jenkins testified that appellant was still outside with Pop arguing when she noticed that he had a gun. She stated that appellant started to shoot. She did not notice Robyn the first time appellant was shooting; however, she testified that the second time she saw appellant shooting, Robyn was walking back toward the car from the Lodge. Jenkins stated that at that particular time she saw Robyn fall to the ground and then saw appellant jumping the fence. She stated that she then ran over to Robyn and called others to help her.

Jenkins stated that during this time people were fighting and some more shooting had started around them. Jenkins testified that she, along with Chris Ross and Melody and Stephanie Harris, put her sister in the car and took her to the hospital. Jenkins also testified at trial that she did not remember anyone else shooting while appellant was shooting, which was at the time when she saw her sister fall on the ground. In addition to Jenkins's testimony, several other State witnesses testified that they saw appellant at the Elk Lodge when the incident occurred and saw him shooting a gun. The witnesses also testified that gunshots were coming from different directions and numerous people were fighting. One witness, Larry Buckley, testified that he was at the Lodge around two-thirty in the morning of July 30, 1995, and saw appellant shooting. Buckley also stated that he saw Ross at the Lodge with a gun. Patrick Strickland testified that he went to the Lodge with Ross on the evening of July 29, 1995. He stated that Ross had a .45 caliber gun and tried to shoot it in the air but the gun was jammed and would not shoot. Strickland testified that he thought Ross had gotten the gun unjammed but that he did not see him shoot it. Strickland also testified that he heard four or five shots but could not tell if these shots came from the same gun.

Chris Ross also testified at trial. Ross stated that he shot the gun in the air in an attempt to stop the fighting at the club. He claimed to only have shot the gun once. Ross further testified that he saw appellant shoot a gun first in the air and then in the crowd. Travis Bell, appellant's brother, testified that between 4:00 and 5:00 o'clock in the morning of July 30, 1995, appellant and his mother came by his house. Bell stated that appellant's mother asked him if he could take appellant to the bus station because she was "tired of fooling with him." Bell testified that he drove appellant to the bus station in Little Rock. Bell claimed that after driving appellant to the bus station he found a pistol under the passenger seat of his car. Bell stated that he had not seen this pistol prior to that time and thereafter turned it over to the police.

Rick McKelvey, an investigator with the State Police, testified that he was contacted on July 30, 1995, regarding a shooting in Fordyce. He conducted a crime-scene search and examined the victim's body at Dallas County Hospital. McKelvey stated

that, in the course of his investigation, he obtained a weapon from Bell. McKelvey identified the weapon as a nine-millimeter pistol. McKelvey also testified that while interrogating appellant, appellant stated that he was at the Elk's Lodge on the evening in question and that he was in possession of a small nine-millimeter pistol belonging to his cousin. McKelvey further stated that appellant told him he fired the gun once into the air. On cross-examination, when asked about the type of bullet which caused the victim's wound, McKelvey testified that it could not have been caused by a .45 bullet, and was smaller than a .357 or a .38 bullet. However, McKelvey could not identify the exact size bullet which caused the wound below that range, other than to state that a .45 could not have caused such a wound.

Charles Teppenpaw, the Dallas County Coroner, testified at trial regarding his examination of the victim. Teppenpaw, at the time of the trial, had been a coroner for approximately fifty years and had recently been appointed forensic medical examiner. Teppenpaw testified that appellant died of a gunshot wound which entered her back on the right side and exited the left chest. Teppenpaw stated that he concentrated his examination on the entrance and exit wounds and made a determination of what type of bullet may have caused the wound. Over appellant's objection, Teppenpaw testified as to the manner in which he made such determination. He stated that he carried sample bullets such as .22s, .38s, .45s, and nine-millimeters and matched those to the wound on the victim. Teppenpaw testified that he tried to match the .38, the .32, the .45, and the nine-millimeter bullet to the victim's wound. He stated that, of these bullets, the only one that he could identify to fit the victim's wound was the nine-millimeter bullet.

■ Viewing the evidence in the light most favorable to the State, as we must, we hold that in the case at bar there was substantial evidence to support appellant's conviction. The State offered testimony which placed appellant at the scene of the crime shooting a gun in the direction of the victim. The victim was seen falling to the ground immediately after appellant fired his gun. A gun, whose size bullet fit the victim's wound, was recovered by appellant's brother after he had taken him to the bus sta-

tion. In addition, testimony regarding shots being fired by Ross, the victim's cousin, involved a .45 caliber gun to which both the investigating officer and the coroner testified could not have caused the victim's fatal wound. The State also presented sufficient evidence in this case from which the jury could infer that appellant's actions were done with the purpose of causing serious physical injury to another person which resulted in the death of Robyn Owens.

Furthermore, reconciling conflicts in the testimony and weighing evidence are matters within the exclusive province of the jury, and the jury's conclusion on credibility is binding on this court. *Ashley v. State*, 22 Ark. App. 73, 732 S.W.2d 872 (1987). Jurors are allowed to draw upon their common knowledge and experience in reaching a verdict from the facts directly proved. *Ashley, supra.* It has also been held that the action of fleeing from the scene of the crime is relevant to the issue of guilt. *Jones v. State*, 282 Ark. 56, 665 S.W.2d 876 (1984).

Appellant's second argument on appeal involves the coroner's testimony. Specifically, appellant argues that it was error for the judge to allow the coroner to testify regarding his process of matching bullets to the victim's wound and stating as a result that a nine-millimeter bullet matched the victim's wound. The coroner was not qualified as an expert in this case. His testimony, therefore, falls under Rule 701 of the Arkansas Rules of Evidence. Rule 701 states that:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) Rationally based on the perception of the witness; and
>
> (2) Helpful to a clear understanding of his testimony or the determination of a fact issue.

Ark. R. Evid. 701 (1997). A trial judge's decision to allow lay-opinion testimony under Rule 701 will not be reversed absent an abuse of discretion. *Bridges v. State*, 327 Ark. 392, 327 S.W.2d 392 (1997).

■ In *Carton v. Missouri Pac. R.R.*, 303 Ark. 568, 798 S.W.2d 674 (1990), the supreme court, citing Professor Weinstein, stated the following applicable principles with regard to Rule 701:

> Rule 701 "seeks to balance the need for relevant evidence against the danger of admitting unreliable testimony. It recognizes that necessity and expedience may dictate receiving opinion evidence, but that a factual account insofar as feasible may further the values of the adversary system. . . . 'The opinion rule today is not a rule against opinions but a rule conditionally favoring them.'". . .
> [I]n order to satisfy the first requirement of Rule 701, the testimony must initially pass the personal knowledge test of A.R.E. Rule 602. But, even if the witness does have the requisite personal knowledge, any inferences or opinions he expresses must thereafter pass the rational connection and "helpful" tests of Rule 701. "The rational connection test means only that the opinion or inference is one which a normal person would form on the basis of the observed facts. He may express the opinion or inference rather than the underlying observations if the expression would be 'helpful to a clear understanding of his testimony or the determination of a fact in issue.'" If, however, an opinion without the underlying facts would be misleading, then an objection may be properly sustained.

*Carton*, 303 Ark. at 571-72, 798 S.W.2d at 675 (quoting 3 WEIN-STEIN'S EVIDENCE ¶ 701[02] at 701-13(1987)).

■ The court has also held that lay witnesses may be permitted to give their opinion as to the cause of death or other physical condition if the witness is qualified by experience and observation with regard to the subject matter. *Russell v. State*, 306 Ark. 436, 815 S.W.2d 929 (1991). In *Russell*, the court held that the opinion testimony of an emergency medical technician concerning the instrument which caused the victim's wounds was properly admitted pursuant to Rule 701. The medical technician testified that in his opinion the wounds were caused by a square-headed or Phillips head screwdriver. Appellant argued that because the medical technician lacked specialized training and expertise, he should not have been allowed to testify regarding the cause of the wounds. The court held that the testimony was based upon the technician's personal knowledge, having previously observed wounds made by screwdrivers, and based upon the

observation of the victim's wounds. In addition, the technician's opinion was helpful to the determination of a fact in issue, the cause of the victim's wounds. *Russell, supra.*

In *Moore v. State*, 323 Ark. 529, 915 S.W.2d 284 (1996), the court held that the opinion testimony of a lay witness in accordance with Rule 701 was proper. The crime lab in *Moore* had been unable to identify or eliminate the shoe print found in the victim's bedroom as having been made by appellant's shoe due to the lack of sufficient individual markings, but noted that the shoe-sole pattern of the print was consistent with the pattern on appellant's shoe. The police investigator, during direct examination, however, testified that in his opinion the sole of appellant's athletic shoe matched the shoe print found on the center of the victim's bedroom floor. The court held that the trial court did not abuse its discretion in allowing the investigator's testimony because, even though the investigator was not an expert in that field, he had some experience in that area and he was clearly testifying that the patterns matched, which was not inconsistent with the crime lab report. *Moore, supra.*

In the case at bar, we cannot say that the trial court abused its discretion in allowing the coroner's lay-opinion testimony, subject to cross-examination. The situation is essentially analogous to that in *Russell* and, as in *Moore,* the coroner's testimony was not inconsistent with the testimony of Officer McKelvey, which had previously been admitted without objection.

Affirmed.

BIRD, ROGERS, and STROUD, JJ., agree.

NEAL and CRABTREE, JJ., dissent.

OLLY NEAL, Judge, dissenting. Because the majority has chosen to ignore the patent unfairness of convicting an accused person based on wholly unreliable and unsubstantiated opinion testimony, I must dissent. The inherent prejudice in this case is obvious. No witness saw appellant shoot the victim. No evidence was introduced tending to connect the weapon appellant admitted he fired into the air and the wound that caused the victim's death. There *was* evidence that other weapons were fired

around the time the victim was shot. Noticeably absent are ballistic evidence or other competent forensic evidence connecting the appellant and his gun to the crime.

Although the trial court based its admissibility ruling on the fact that the coroner was never qualified as an expert, he noted the coroner's fifty years of experience when he decided to allow him to testify. The supreme court has recognized that in some instances, the rational basis for qualifying a lay opinion as reliable is little different from the evidence requisite to showing that the witness is an expert in his field of knowledge. *See Ferrell v. State*, 305 Ark. 511, 810 S.W.2d 29 (1991), and *Gruzen v. State*, 276 Ark. 149, 634 S.W.2d 92 (1982). It follows that it is not acceptable to "gloss-over" the reliability requirement by using Ark. R. Evid. 701 to admit unreliable expert testimony as a lay opinion. *See Williams v. Southwestern Bell Tel. Co.*, 319 Ark 626, 893 S.W.2d 770 (1995).

As the majority writes, quoting from *Carton v. Missouri Pac. R.R.*, 303 Ark. 568, 798 S.W.2d 674 (1990), in addition to establishing the reliability of a lay opinion, the State must show that the opinion would be helpful to the trier of fact in understanding the witness's testimony. The lay witness must be qualified by experience and observation as to the subject matter. *Tallant v. State*, 42 Ark. App. 150, 865 S.W.2d 24 (1993). And the testimony must not be overly prejudicial. Ark. R. Evid. 403.

In *Felty v. State*, 306 Ark. 634, 816 S.W.2d 872 (1991), the supreme court noted two limitations on lay opinions: (1) the witness must have firsthand knowledge, and (2) the testimony must help resolve some issue in the case. If attempts are made to introduce meaningless assertions which amount to little more than "choosing up sides," exclusion is called for by the rule. *Felty* (citing Advisory Committee's Notes to Federal Rule 701). The rule was deciphered more clearly in *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991). There, where the issue was whether the trial court erred in refusing to admit the results of DNA testing where the reliability of the testing process had not been established, the court adopted the "relevancy standard." The relevancy approach requires that the trial court conduct a preliminary inquiry which

must focus on (1) the reliability of the novel process used to generate the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse or mislead the jury, and (3) the connection between the novel process evidence to be offered and the disputed factual issues in the particular case. *Id.* at 186. Although *Prater* involved the admissibility of *expert* testimony, its rule should be applied in the present case, because the standard would be essentially the same for establishing the reliability of the coroner's testimony if he were qualified as an expert. *See Gruzen, supra.*

Here, the coroner testified that he determined that the victim had been killed by a nine-millimeter bullet by a *forensically novel* process of placing several different-sized bullets in the fatal wound and eliminating all but one, based on the way the bullet fit the hole in the victim's body. It cannot be argued that this process has ever been recognized as an accurate means of determining the instrumentality of death, and it in no way relates to the commonly used method of ballistic examinations. The trial court cited only the coroner's fifty years' experience in determining the cause of death, and made no inquiry as to whether the coroner had the ability to properly explain the ramifications of his "findings" or whether he could relate them to the disputed factual issue of whether appellant fired the bullet that killed the decedent. Because there was no evidence that any of the shooters at the scene except appellant possessed a nine-millimeter, the obvious conclusion that would be drawn from the coroner's testimony in this particular case is that the appellant did, in fact, fire the fatal shot. The coroner's opinion amounted to "little more than choosing up sides," and therefore should have been excluded.

Some cases that further illustrate the error of the court's ruling are *Houston v. State*, 321 Ark. 598, 906 S.W.2d 286 (1995); *Young v. State*, 321 Ark. 225, 871 S.W.2d 373 (1994); *Palmer v. State*, 315 Ark. 696, 870 S.W.2d 385 (1994); and *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993). In all of these cases, the court dealt with the issue of whether the results of luminol testing, an unrecognized scientific test for the presence of blood, was admitted in error. The Supreme Court concluded in each that, because the procedure did not distinguish between human and other type blood, without additional test to confirm that the

blood found was human blood, admitting the results were *per se* misleading and overly prejudicial. In *Houston*, in particular, the supreme court noted that luminol testing can return a "false positive," and for that reason declared the results irrelevant without "additional factors that relate the evidence to the crime." In the present case, the exact calibers of the weapons present at the murder scene were never established, but there was testimony that in addition to the nine millimeter, a .38, a .357 and a .45 were fired. It is widely recognized among firearm experts that the .38, .357, .380 and the .9 millimeter are all in the same class of weapons and the cartridges are substantially the same in diameter. In fact, the .380 and the .9 millimeter are *exactly the same diameter*. Because the coroner's "ballistic testing" consisted only of inserting a bullet into the wound to determine the nature of the projectile that caused it, the similarity between bullets could just as easily result in a "false positive." Without further testing to confirm his results, the possibility that the jury could have been misled by the coroner's testimony is infinite. *See also Ferrell v. State, supra* (Arkansas Supreme Court recognized that difference between certain handgun barrel diameters are so slight that the difference can not be discerned by casual observation).

This case is somewhat different than *Russell v. State* 306 Ark. 436, 815 S.W.2d 929 (1991), upon which the majority relies for its decision. There, although, based upon his experience, an emergency medical technician was allowed to give his opinion that the victim's wounds were caused by a screwdriver, the opinion was a general one with less potential to mislead the jury. He was not allowed to speculate as to what type screwdriver caused the wound and there was eyewitness testimony that the appellant had in fact stabbed the victim with a screwdriver. In the case at bar, the coroner was qualified, to give his opinion that the decedent's wound was caused by a bullet, but he had no experience in ballistics that would provide an ample basis for his opinion that the bullet was of a particular caliber. Also, unlike the *Russell* case, there was no eyewitness testimony to corroborate the coroner's conclusion.

In summation, the trial court's decision to allow the coroner to give an opinion that the victim's wound was caused by a nine

millimeter bullet was erroneous because (1) the State failed to establish that the test procedure was reliable; (2) the testimony was overly prejudicial; (3) the coroner's testimony was misleading; and (4) there was no evidence tending to link the coroner's "findings" to appellant, and it was therefore irrelevant. *See also Middleton v. State*, 29 Ark. App. 83, 780 S.W.2d 581 (1989) (officer's testimony fixing appellant's alcohol level at specific level based on physical test held inadmissable and manifestly prejudicial).

I am authorized to state that Judge CRABTREE joins in this dissent.