REGIONS BANK, as Permanent Guardian of the Estate of Willard Gene Harris, *A Minor*, and Lindsey Marie Bumpus, Individually *v.* Michael HAGAMAN, M.D.

CA 01-1187                                          84 S.W.3d 66

Court of Appeals of Arkansas
Division IV
Opinion delivered September 11, 2002

*J. Scott Davidson* and *Bradley C. Crawford*, for appellants.

*Cox Law Firm*, by: *Walter B. Cox* and *James R. Estes*, for appellee.

JOHN E. JENNINGS, Judge. In August 1998, Willard Harris was delivered by Dr. Michael Hagaman. The delivery was complicated by a shoulder dystocia, described as a medical emergency in which the baby's head is delivered but one or both of the child's shoulders are stuck within the birth canal. After the child's birth, he was diagnosed with a permanent brachial plexus injury, a nerve injury to the right shoulder.

Lindsey Bumpus, the child's mother, and Regions Bank, the guardian of the child's estate, sued Dr. Hagaman in Baxter County Circuit Court alleging malpractice. During the jury trial each side presented the testimony of one expert witness: Dr. Bruce Bryan, an obstetrician from St. Louis, Missouri, testified for the plaintiffs and Dr. Herbert Sandmire, an obstetrician from Green Bay, Wisconsin, testified for the defendant. The jury found in favor of the defendant and the circuit court entered judgment on the jury's verdict. Regions Bank and Ms. Bumpus now appeal.

Appellants' sole argument for reversal is that the circuit court erred in refusing to grant their motion in limine seeking to prohibit the defendant's expert, Dr. Sandmire, from testifying at trial. We find no error and affirm.

The case cannot be understood without at least a summary of the testimony of the expert witnesses. Dr. Bruce Bryan had practiced as an obstetrician for twenty years. He testified that he was familiar with "guidelines or rules" which doctors are taught to follow when dealing with a shoulder dystocia delivery. He said that a shoulder dystocia will occur in approximately one out of 100 deliveries. A shoulder dystocia is an emergency which must be dealt with immediately. Dr. Bryan said the first rule is not to lose your head.

Dr. Bryan testified that he was not certain exactly what was meant by "bilateral shoulder impaction," but that he believed that both of the child's shoulders were stuck during delivery. He testified that the first thing that should be considered is the adequacy

of the episiotomy (an incision to enlarge the birth canal). Dr. Bryan said the next two steps that should be taken are that the patient should be put in the "McRoberts position," which rotates the pelvis and changes the angle, and then suprapubic pressure should be applied manually. He testified that he usually did the McRoberts maneuver first and then would add suprapubic pressure. He testified that he did not believe that the weight of the mother, 294 pounds in this case, made any difference in the efficacy of applying suprapubic pressure.

Dr. Bryan then described what he characterized as a "second tier" of options which might be performed if the McRoberts maneuver and suprapubic pressure were unsuccessful to deliver the baby. He testified that the delivery of the posterior arm of the child is a possible maneuver, but that there is a risk of breaking the baby's arm or collarbone. He testified that he could not perform this maneuver because his hands were too big.

He also described the "Woods screw maneuver," which also involves reaching up into the birth canal. In this procedure the doctor tries to rotate the baby within the birth canal. He described a third maneuver called the "Rubin maneuver" in which the doctor tries to "shrug" the shoulders. If these steps aren't successful one must escalate traction, meaning that the baby must be pulled out. He testified that a brachial plexus injury can occur even when the delivering doctor has done nothing wrong and that it had happened to him. He also discussed the Zavanelli maneuver in which the baby's head is pushed back into the birth canal and a Caesarean section is performed. Dr. Bryan testified that a 1998 article in *Precis: Obstetrics* (2d ed. 2000), a medical treatise, stated that eighty-five to ninety percent of shoulder dystocias are relieved without injury to the fetus with the use of the McRoberts maneuver and suprapubic pressure.

Dr. Bryan testified that the record of delivery did not show that Dr. Hagaman attempted to use suprapubic pressure or the Woods screw maneuver, or that he attempted to deliver the posterior arm. Dr. Bryan said:

> I believe that suprapubic pressure would have relieved this shoulder dystocia, again eighty-five percent of the time, and we wouldn't have been to the point where the Woods screw would have been an issue, so the question of whether the standard of care required this defendant to attempt to do the Woods screw maneuver is a difficult question for me to answer. I think the real problem is not doing simple suprapubic pressure, which does not cause injury and which works much of the time.

Dr. Bryan testified that the delivering doctor would have had about four to five minutes to perform various maneuvers before the child might have suffered brain damage. He testified that he could not guarantee that the child would have been delivered safely had suprapubic pressure been applied and that a brachial plexus injury can occur while the child is still in the uterus even without a shoulder dystocia. He testified that the occurrence of a brachial plexus injury does not mean that the obstetrician was not within the standard of care.

On cross-examination, Dr. Bryan testified that there are times when the doctor has to apply that degree of force necessary to deliver the baby. He conceded that a subsequent version of the *Precis* article, published in 2000, omitted the statement that eighty-five to ninety percent of shoulder dystocias can be safely resolved by the use of McRoberts and suprapubic pressure. He conceded that there was no protocol that should serve to substitute for clinical judgment during delivery. He said, "If McRoberts does not work, you increase the traction and if pressure doesn't work, increase the traction, if something else doesn't work, then you kind of start over again."

Dr. Herbert Sandmire had delivered almost 11,000 babies since he began his career as an obstetrician and gynecologist in 1959. He had taught at the University of Wisconsin Medical School and had published thirty-six scientific articles, some of which dealt with the problems of brachial plexus injury and shoulder dystocia. He testified that bilateral shoulder dystocia, while uncommon, is described in the literature. He explained why delivery of the posterior arm and the Woods screw maneuver were

not viable options for a bilateral shoulder dystocia. He testified that there was no recognized order of procedure that a doctor must follow to deliver a baby who presents with a shoulder dystocia. He said that he attempted to discover who authored the 1998 *Precis* article referred to by Dr. Bryan but was unable to do so. He said that the weight of the mother does decrease the ability to use suprapubic pressure. He testified that in his opinion it was not a violation of the standard of care for Dr. Hagaman not to have had the nurse apply suprapubic pressure. He expressed his opinion that suprapubic pressure would not have been effective in this case because of the mother's weight. He said that, in his view, no one with any authority has ever purported to lay down strict rules by which babies must be delivered once a shoulder dystocia has occurred. Dr. Sandmire testified that his opinion that suprapubic pressure would not have been effective in this case was based on his own experience in delivering babies, but was also supported, to a certain extent, by an article written by a Dr. Gherman, a recognized authority in this field.

██ There is no dispute between the parties on the applicable substantive law. The plaintiffs had the burden of proving medical malpractice. Under Ark. Code Ann. § 16-114-206(a) (1987), the plaintiffs had the burden of proving the applicable standard of care, that the physician failed to act in accordance with that standard, and that such failure was a proximate cause of the plaintiff's injuries. *See Blankenship v. Burnett*, 304 Ark. 469, 803 S.W.2d 539 (1991).

The key issue at trial was whether Dr. Hagaman violated the applicable standard of care in not applying suprapubic pressure. The issue on appeal is whether or not the trial court erred in permitting Dr. Sandmire to testify. Appellants argue that Dr. Sandmire's testimony was not shown to be sufficiently reliable under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for the trial court to permit his testimony to come before the jury. We disagree.

██ In *Daubert*, the plaintiffs had sued a pharmaceutical company alleging that certain birth defects were caused by the

mother's prenatal use of the prescription drug, Bendectin. The trial judge excluded the proffered testimony of plaintiff's expert witnesses based on the "general acceptance" standard established in *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923). The Court of Appeals affirmed, but the United States Supreme Court reversed, overruling *Frye* in the process. The Court held that the Federal Rules of Evidence "occupied the field" and that those rules, and more particularly Rule 702, determined the issue. Arkansas Rule of Evidence 702, identical to the corresponding federal rule, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In the course of its opinion the Court held that the trial judge has a "gate-keeping role" in regard to the admissibility of expert testimony and stated that a "pertinent consideration is whether the theory or technique has been subjected to peer review and publication." 509 U.S. at 593.

In *Farm Bureau Mutual Insurance Co. of Arkansas, Inc. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), the Arkansas Supreme Court adopted the holding in *Daubert*.[1] The court was not obliged to do so — *Daubert* is not a matter of federal constitutional law. This court is obliged to follow *Foote*, and we did so in *Wood v. State*, 75 Ark. App. 22, 53 S.W.3d 56 (2001).

Since *Daubert*, the United States Supreme Court has decided two other cases in this area of the law: *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). We have no reason to think that the Arkansas Supreme Court will not follow those decisions as well.

---

[1] Two years before *Daubert* was decided the Arkansas Supreme Court had adopted a similar approach in *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991).

■ Our standard of review is clear: the test is whether the trial court abused its discretion in admitting, or excluding, the proffered expert testimony. *General Electric Co. v. Joiner, supra; Sims v. Safeway Trails, Inc.,* 297 Ark. 588, 764 S.W.2d 427 (1989); *Wood, supra.*

In contending that Dr. Sandmire's testimony was not shown to be sufficiently reliable to permit its admission, appellants rely on a statement from *Foote*: "In short, Farm Bureau, as the proponent of novel scientific evidence, failed to carry its burden of proof on the issue of reliability. *Foote,* 331 Ark. at 117, 14 S.W.3d at 520. *Foote* did involve "novel scientific evidence" – the ability of a dog to reliably detect the presence of accelerants after a fire. So did *Wood* (whether taking the prescription drug Paxil would cause a person to engage in deviant sexual activity). The testimony in *Daubert* could be considered "novel scientific evidence–" but we are reluctant to so characterize the testimony in the case at bar. Dr. Sandmire testified that, by and large, the process of delivering a baby is pretty much the same as it was in the 1950's when he began practice. As Mr. Justice Stevens has said, "It is not intrinsically 'unscientific' for experienced professionals to arrive at a conclusion by weighing all available scientific evidence – this is not the sort of 'junk science' with which *Daubert* was concerned." *Joiner,* 522 U.S. at 153 (op. concurring in part and dissenting in part).

■ The crux of appellants' argument is that certain of Dr. Sandmire's opinions are not specifically supported by articles found in the medical literature. But the court in *Daubert* made clear that publication is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability.

Appellants' view seems to be that the trial judge's duty is to apply the criteria mentioned in *Daubert* in a rigid fashion, with a view toward excluding questionable testimony. This is not the teaching of *Daubert* or its progeny.

■ ■ The *Daubert* court made it clear that the basic standard of relevance provided in Rule 402 is a liberal one; that the

inquiry envisioned by Rule 702 is a flexible one; and that the focus must be solely on principles and methodology, not on the conclusions they generate. The Court said:

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.
>
> . . .
>
> These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

509 U.S. at 596. In *Kumho Tire, supra,* the United States Supreme Court concluded that the trial judge must have considerable leeway in deciding in a particular case how to determine whether particular expert testimony is reliable. The court said: "Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." 526 U.S. at 153.

■ It is true, as appellants contend, that the fact that an expert is well credentialed does not automatically mean his testimony will be admissible under *Daubert.* Even so, outstanding credentials are a factor favoring admissibility.

■ Our conclusion is that Dr. Sandmire was properly permitted, under Ark. R. Evid. 702, to testify as an expert in the case at bar.

Affirmed.

ROBBINS and CRABTREE, JJ., agree.