ARROW INTERNATIONAL, INC. *v.* Misty Long SPARKS,
Administratrix of the Estate of
Robert "Grumpy" Long, *Deceased*

CA 02-75                                                    98 S.W.3d 48

Court of Appeals of Arkansas
Division I
Opinion delivered February 12, 2003

44

*Wright, Lindsey & Jennings LLP*, by: *Roger A. Glasgow, Troy A. Price*, and *Kyle R. Wilson*, for appellant.

*Belew & Bell*, by: *John M. Belew* and *Steve Bell*; *Murphy Law Firm*, by: *Tom Thompson*; and *Rieves, Rubens & Mayton*, by: *Kent J. Rubens*, for appellee.

KAREN R. BAKER, Judge. This is an action brought by appellee Misty Sparks for the wrongful death of her father, Robert "Grumpy" Long. Mr. Long bled to death on December 18, 1997, while he was a patient at the Baptist Medical Center in Little Rock. Appellee sued the hospital, the attending physicians, and appellant Arrow International (hereafter "Arrow"), alleging that their conduct proximately caused her father's death. After settling her claims against the hospital and the physicians, appellee proceeded to trial against Arrow and received a $700,000 compensatory damage verdict. The jury apportioned twenty-five percent of the fault to Arrow, thus making it liable for $175,000 of the award. In addition, the jury held Arrow liable for 4 million dollars in punitive damages.

Arrow appeals from the verdict and makes four arguments. The first three involve evidentiary rulings by the trial court on the admission of expert testimony, the admission of prior, similar occurrences, and the exclusion of a witness's deposition testimony. The fourth argument concerns the punitive-damage award. We find no error on any issue presented and therefore affirm the jury's verdict.

Arrow manufactures a medical device called a percutaneous sheath introducer (PSI). The PSI facilitates the insertion of catheters into a patient's body. The particular device at issue in this case is a two-piece apparatus. One piece is a long, straight sheath introducer, shaped something like a straw, with a lock on the end. The second piece has a valve that attaches to the end of the sheath lock and a clear plastic tube that dangles from a side port of the valve. The tube has a sealing cap on the end. When the PSI pieces are attached and implanted into a patient, the sheath introducer is

placed in the patient's vein, usually the jugular vein; the valve remains outside the patient, as does the side tube, which may be used for the introduction of fluids. If a catheter is threaded through the valve and sheath introducer, a catheter guard is often placed around the valve.

On December 11, 1997, Robert Long had a kidney removed at the White River Medical Center in Batesville, pursuant to a diagnosis of cancer. While there, a PSI was inserted into his right jugular vein to facilitate the use of a Swan–Ganz catheter, which monitored his cardiac output. On December 17, 1997, Long was transferred to Baptist Medical Center in Little Rock with the PSI still implanted and the Swan–Ganz catheter still attached. He was kept in intensive care for a period, but thereafter, his Swan–Ganz was removed, and he was transferred to a regular room. The PSI remained implanted, although it was not in use. According to the ICU nurse, she secured the valve and the side tube against Long's body with tape before he was transferred.

On December 18, the floor nurse checked on Long at 2:40 a.m. and noted no problems. However, at 3:18 a.m., the nurse returned to the room and found a large pool of blood. Long was dead, having bled to death.

Appellee, as administratrix of her father's estate, sued appellant on a products–liability theory, alleging that the two–piece design of the PSI was inherently dangerous and that the separation of the two pieces had caused Long to bleed to death. At trial, she advanced the theory that, when the catheter guard was removed from the PSI by turning it in a counter–clockwise motion, the valve, which likewise loosened in a counter–clockwise motion, inadvertently separated from the sheath, causing blood to flow from the separation point. Arrow defended on the theory that the bleeding occurred not from the point where the two pieces of the unit conjoined but through the side tube, from which Long had apparently removed the end cap.

To support its theory, Arrow presented the testimony of two nurses who said that, when Long's condition was discovered, they saw blood coming from the side tube. Arrow also called Carl Botterbusch, the vice-president and general manager of its Cardiac

Assist Division, who testified that, in his opinion, Long bled to death out of the side tube. Another of Arrow's experts, Dr. Alfred Gervin, testified that it would have been possible for a patient to bleed to death out of the side tube in twenty minutes. To rebut this testimony, appellee called Dr. Brock Allen, who testified: "I do not think there's any way that [Long] could have ever bled to death through this tiny hole with this small amount of pressure pushing the blood in that direction because it would have clotted before he ever lost his entire blood volume and died from that." Arrow objected to Allen's testimony on the grounds that he had no expertise in fluid mechanics and his opinion had no reliable scientific basis, as required by *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). The trial judge allowed Dr. Allen to testify, and for its first issue on appeal, Arrow contends that the admission of Allen's testimony was error.

█ █ The admission of rebuttal evidence is within the sound discretion of the trial court, and we will not reverse absent an abuse of discretion. *Farm Bureau Mut. Ins. Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000). Further, if an opponent of expert testimony contends that the expert is not qualified, the opponent bears the burden of showing that the testimony should be stricken. *See Collins v. Hinton*, 327 Ark. 159, 937 S.W.2d 164 (1997). With these standards in mind, we address Arrow's first claim that Dr. Allen testified regarding a matter that was outside his area of expertise.

█ Arrow contends that Dr. Allen was not qualified to offer an opinion regarding blood flow through the side tube because he was not an expert in fluid mechanics. We disagree. While experts may not offer opinions that range too far outside their area of expertise, *see, e.g., Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2002), the opinion rendered by Dr. Allen did not require him to be an expert in any field other than the one in which he was unquestionably qualified, the field of medicine. Dr. Allen was an emergency room physician with approximately sixteen years of experience. He was familiar with the two-piece PSI and the diameters of both its tubes (2.8 mm on the sheath introducer and 1.6 mm on the smaller side tube). In his practice, he had used "triple-lumen" catheters with small diameters like that of

the PSI's side tube. He explained to the jury that, based on his experience with the triple-lumens, which required the administration of a special solution to keep a patient's blood from clotting, Long's blood would have clotted before he bled to death through the side tube. He also told the jury about his consultation with another physician, Dr. Margaret Kuykendall, who also did not believe that Long could have bled such a large amount out of the small side tube opening. Finally, he testified that, in all his years of practice, he had never heard of a person bleeding to death through a tube like the side tube of the PSI.

■  Rule 702 of the Arkansas Rules on Evidence entitled "Testimony of Experts" reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, *experience*, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added.) The rule expressly recognizes that an expert's testimony may be based on experience in addition to knowledge and training. Further, Ark. R. Evid. 704 permits an expert to rely, as Dr. Allen did, on information provided by others in the formulation of his opinion. *See Killian v. Hill*, 32 Ark. App. 25, 795 S.W.2d 369 (1990).

■ ■  If some reasonable basis exists demonstrating that a witness has knowledge of a subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Brunson v. State, supra.* There is a decided tendency to permit the factfinder to hear the testimony of persons having superior knowledge in a given field, unless they are clearly lacking in training and experience. *Killian v. Hill, supra.* Dr. Allen's experience as an emergency room physician and his attendant knowledge of blood flow through small tubes gave him an insight into the subject beyond that of the ordinary person. The fact that Dr. Allen's testimony was not based on flow rates, viscosity, friction, or other scientific properties of blood flowing through a 1.6 mm opening, was a matter for the jury to consider in determining the weight to

be accorded Dr. Allen's testimony.[1] The questionability of the factual underpinning of an expert's opinion goes to the weight and credibility, rather than to the admissibility, of the opinion in evidence. *See Killian v. Hill, supra.*

■ ■ Arrow's other argument on this point is that Dr. Allen's testimony did not meet the *Daubert* test of reliability. This test is derived from the landmark Supreme Court case of *Daubert v. Merrell Dow Pharmaceuticals, supra,* in which the Supreme Court established an inquiry to be conducted by the trial court when faced with the admissibility of certain expert testimony. As our supreme court explained in *Farm Bureau Mutual Insurance Co. v. Foote, supra,* in adopting *Daubert,* a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Farm Bureau Mut. Ins. Co. v. Foote, supra.* This inquiry entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* A primary factor for a trial court to consider in determining the admissibility of scientific evidence is whether the scientific theory can be or has been tested. *Wood v. State,* 75 Ark. App. 22, 53 S.W.3d 56 (2001). Other factors include whether the theory has been subjected to peer review and publication, the potential error rate, and the existence and maintenance of standards controlling the technique's operation. It is also significant whether the scientific community has generally accepted the theory. *Id.*

■ ■ This preliminary assessment of reliability is known as the trial court's gatekeeping function. *See Wood v. State, supra.* We observe that, in the more recent case of *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), the Supreme Court clarified that the *Daubert* factors are not limited to *scientific* expert testimony but may be applied to testimony based on technical or other specialized knowledge.

---

[1] In fact, Arrow's counsel ably cross-examined Dr. Allen in this regard.

██ Arrow argues that Dr. Allen's testimony did not meet the *Daubert* test because it was not based on testing or other scientific method but was merely "anecdotal" and that the trial court, by allowing Allen's testimony, failed to perform its gatekeeping function. However, we conclude that the *Daubert* inquiry, which seeks to determine the dependability of an expert's methods, is of little value in the present case. First of all, our court has stated that the *Daubert* factors are applicable to "novel" scientific evidence, theory, or methodology. *See Regions Bank v. Hagaman,* 79 Ark. App. 88, 84 S.W.3d 66 (2002). Allen's testimony in this case is not novel in any respect. Additionally, the *Daubert* and *Kumho Tire* opinions recognize that not all expert testimony is subject to the *Daubert* analysis. The inquiry to be made by the trial court is a flexible one, not a rigid one. *See Daubert,* 509 U.S. at 594-95; *Regions Bank v. Hagaman, supra.* Further, the *Daubert* factors neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire,* 526 U.S. at 141. The law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *Id.* at 142; *Regions Bank v. Hagaman, supra.* Moreover, the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Kumho* at 150.

██ ██ Dr. Allen's testimony in this case was based on experience and observations rather than methodology, and his opinion was not buttressed by scientific or technical testing or analysis. We recognize that a *Daubert* inquiry *may*, in some instances, help to evaluate the reliability of experience-based testimony, *Kumho* at 151; however, a *Daubert* inquiry into the reliability of Dr. Allen's testimony was not warranted in this particular case. Nevertheless, we note that the trial court conducted a reliability inquiry, out of the jury's presence, to determine Allen's experience and familiarity with blood flow and clotting. We conclude that the trial court did not abuse its discretion in admitting Dr. Allen's rebuttal testimony.

The next issue concerns the trial court's admission of thirty-six Medical Device Reports (MDRs), generated by Arrow pursu-

ant to federal law.[2] Such reports record incidents of medical device malfunction and contain short but detailed descriptions of what happened in each case. Appellee initially planned to introduce approximately sixty reports of incidents that occurred between 1991 and 2000 in which a patient died or suffered serious injury when a sheath introducer disconnected from a valve in an Arrow two-piece PSI. The trial judge ruled that some of the MDRs contained incidents that were not substantially similar to the incident in this case, and he excluded some of the MDRs. However, he allowed the introduction of thirty-six prior incidents that occurred between 1992 and 1997. His ruling was based in part on the testimony of Dr. Margaret Kuykendall that a substantial similarity existed between the information contained in the thirty-six MDRs and the incident that occurred in this case.[3]

The general rule with respect to the admissibility of evidence of similar occurrences is that they are admissible only upon a showing that the events arose out of the same or substantially similar circumstances. *Ford Motor Co. v. Massey*, 313 Ark. 345, 855 S.W.2d 897 (1993); *Houston Gen. Ins. Co. v. Arkansas La. Gas Co.*, 267 Ark. 544, 592 S.W.2d 445 (1980). The burden rests on the party offering the evidence to prove that the necessary similarity of conditions exists. *Massey, supra.* The relevance of such evidence is within the trial judge's discretion, subject to reversal only if an abuse of discretion is demonstrated. *Id.*

Arrow argues that appellee did not meet her burden of proving that the thirty-six incidents reflected in the MDRs were substantially similar. However, Arrow does not tell us how the thirty-six incidents differ from the one in the case at bar. Although it was appellee's burden below to prove the admissibility of the prior occurrences, it is Arrow's burden on appeal to demonstrate reversible error. *Collins v. Hinton, supra.* In any event, we hold that the prior incidents are substantially similar and

---

[2] We use the term "MDR" in this case to include certain complaint logs prepared by Arrow as a prelude to filing an actual report.

[3] Arrow argues that the trial judge erred in relying on Dr. Kuykendall to establish the admissibility of the MDRs, but our review of the record indicates that the doctor's testimony was not the sole basis for the judge's decision. In other words, the judge did not abdicate his responsibility regarding the admission of evidence to an expert witness.

therefore admissible. Our review reveals that each prior incident involved the same Arrow two-piece PSI design as was used on Long. In each case, the two pieces disconnected at the valve, causing the patient to either die or suffer injury. Many of the reports contain words to the effect that the cause of the separation was unknown, although user error or the patient pulling out his catheter were sometimes suspected.

Although appellee did not prove that the circumstances in the prior incidents matched precisely with the circumstances of this case, exact identity of circumstances is not required for admissibility of prior occurrences. *See Ford Motor Co. v. Massey, supra*, citing with approval *Four Corners Helicopters v. Turbomeca, S.A.*, 979 F.2d 1434 (10 Cir. 1992). Appellee did show that the incidents were substantially similar in that they involved the unintended separation of an Arrow PSI in such a manner that death or serious injury resulted. The reports themselves contained data sufficient to conclude that, in the prior instances, a patient died or was seriously injured when, for unknown reasons the PSI separated while the patient was hospitalized.[4] Further, whether an occurrence is substantially similar depends on the underlying theory of the case. *Massey, supra.* Appellee's theory was that the two-piece design was inherently dangerous and separated inadvertently. These prior incidents were introduced to show a propensity for the device to separate inadvertently. Finally, we note that appellee's theory on her punitive-damages claim was that appellant was aware of the dangerous nature of the device yet continued to market it without a proper warning being given to users. The substantial similarity requirement is relaxed when evidence of other incidents is used to show notice or awareness of a potential defect. *Massey, supra.* We conclude that the trial court did not abuse its discretion in admitting the prior, similar occurrences.

We turn now to Arrow's third argument regarding the trial court's decision to exclude the deposition testimony of Sue Hylton, the Risk Assessment Manager at Baptist Medical Center.

---

[4] The only prior incident we question is one that specifically states that the patient's cause of death was not directly attributable to separation of the PSI device. However, this one incident out of thirty-six does not require reversal.

Hylton stated in her deposition that Baptist decided to change from a two-piece PSI to a one-piece model because the one-piece model had a clamp on the side tube. Arrow wanted to use Ms. Hylton's testimony to rebut appellee's inference that Baptist switched from a two-piece PSI to a one-piece unit as a result of Long's death. Appellee objected on the basis of hearsay. The trial court read the deposition and made a page-by-page ruling as to what parts of the deposition he would exclude. Arrow contends that the trial court, by these rulings, prevented it from offering Hylton's testimony regarding the reason for the hospital's switch to a one-piece device. In particular, Arrow argues that Hylton's statements were not hearsay and that her deposition was admissible under Ark. R. Civ. P. 32.

As appellee points out, and our review confirms, the trial court in fact did *not* exclude all the portions of Hylton's deposition that explained the hospital's switch to a one-piece unit. The trial court did not exclude all portions of Hylton's deposition explaining her desire to switch to a device with a thumb clamp. Thus, nothing in the trial court's ruling prohibited Arrow from utilizing a pertinent part of Hylton's testimony, and Arrow is therefore unable to demonstrate prejudice. We will not reverse a trial court's evidentiary ruling absent a showing of prejudice. *Belz-Burrows v. Cameron Constr. Co.*, 78 Ark. App. 84, 778 S.W.3d 126 (2002).

Finally, we address Arrow's argument that its conduct did not merit an award of punitive damages and that the damages awarded were excessive. Arrow's argument on this point asks only that we undertake a *de novo* review of the record in order to determine if the award of punitive damages in this case was unconstitutionally excessive.

A jury may be instructed on punitive damages when there is evidence that a defendant likely knew or ought to have known, in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in reckless disregard of the consequences, from which malice could be inferred. *See Edwards v. Stills*, 335 Ark. 470, 984 S.W.2d 366 (1998); *Dixon Ticonderoga Co. v. Win-*

*burn Tile Mfg. Co.*, 324 Ark. 266, 920 S.W.2d 829 (1996). In reviewing a punitive award, we consider all circumstances, including: the extent and enormity of the wrong, the intent of the party committing the wrong, and the financial and social condition and standing of the defendant. *See Routh Wrecker Serv. v. Washington*, 335 Ark. 232, 980 S.W.2d 240 (1998). We review the proof and all reasonable inferences therefrom in the light most favorable to the appellee, and we determine whether the award is so great as to shock the conscience of the court or demonstrate passion or prejudice on the part of the trier of fact. Id. In addition, we consider whether the punitive award is excessive in light of the defendant's conduct and as compared with the compensatory award. *See BMW of N. Am. v. Gore*, 517 U.S. 559 (1996).

In the present case, the jury awarded a total of $700,000 in compensatory damages of which Arrow was responsible for $175,000. The jury also awarded $4,000,000 in punitive damages attributable to Arrow, which had a net worth of $300,000,000. The evidence showed that in 1995 Arrow was aware, through various reports from the facilities using the two-piece product, of the problem with the two-piece PSI disconnecting, and had notice that numerous deaths and injuries had occurred that were associated with the use of the two-piece product. Further, in 1995 appellant decided to begin recommending the one-peice design, which it claimed was a safer product. Nevertheless, appellant failed to provide adequate and timely warnings to users of the two-piece device, until August 1997 and continued to manufacture and sell the two-piece PSI. Employing the above-mentioned standards, we find no basis for reversal or reduction of the punitive award.

For the reasons stated herein, we affirm.

Affirmed.

BIRD and VAUGHT, JJ., agree.