Mark TURBYFILL *v.* STATE of Arkansas

CA CR 04-958 211 S.W.3d 557

Court of Appeals of Arkansas
Opinion delivered June 29, 2005

148

*William C. McArthur*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

L ARRY D. VAUGHT, Judge. Mark Turbyfill appeals his conviction of rape. He received a sixty-year sentence after a jury found him guilty of raping an eight-month-old girl. On appeal he argues that the evidence was insufficient to support the verdict and that the trial court erred in allowing medical witnesses to testify regarding the cause of the child's injury. We find no error and affirm.

 Because of double-jeopardy concerns, we first consider Turbyfill's sufficiency-of-the-evidence argument — that the trial court erred in its denial of his motion for directed verdict. *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999). We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Id.* In our review of the evidence, we seek to determine whether the verdict is supported by substantial evidence. *Ashe v. State*, 57 Ark. App. 99, 942 S.W.2d 267 (1997). However, we consider only the evidence that supports the conviction without weighing it against other evidence that is favorable to the accused. *Id.* If the evidence is of sufficient certainty and precision to compel a conclusion and pass beyond mere suspicion and conjecture, the evidence is substantial. *Stanton v. State*, 344 Ark. 589, 42 S.W.3d 474 (2001). Further, we do not weigh the credibility of the witnesses on appeal; such matters are left to the factfinder. *Clem v. State*, 351 Ark. 112, 90 S.W.3d 428 (2002). A jury is not required to believe the defendant's version of events because he is the person most interested in the outcome of the trial. *Springston v. State*, 61 Ark. App. 34, 962 S.W.2d 836 (1998). Also, because of the difficulty in ascertaining intent, it is presumed that a person intends the natural and probable consequences of his acts, and the factfinder may draw upon common knowledge and experience to

infer the defendant's intent from the circumstances. *Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000).

■■ We begin our analysis of this case with an examination of the applicable statute. A person commits rape if he engages in sexual intercourse or deviate sexual activity with someone who is less than fourteen years old. Ark. Code Ann. § 5-14-103(a)(1)(C)(i) (Supp. 2001).[1] "Sexual intercourse" is penetration, however slight, of the labia majora by a penis; "deviate sexual activity" is an act of sexual gratification involving penetration, however slight, of the labia majora of one person by any body member or foreign instrument manipulated by another person. Ark. Code Ann. § 5-14-101(1)(B), (10) (Supp. 2001). "In a rape case, penetration can be shown by circumstantial evidence, and if that evidence gives rise to more than a mere suspicion, and the inference that might reasonably have been deduced from it would leave little room for doubt, that is sufficient." *Clem*, 351 Ark. at 117 – 18, 90 S.W.3d at 430. Circumstantial evidence can support a finding of guilt in a criminal case if it excludes every other reasonable hypothesis consistent with innocence, and the question of whether the evidence excludes every other reasonable hypothesis is for the factfinder to determine. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). "Overwhelming evidence of guilt is not required in cases based on circumstantial evidence; the test is one of substantiality." *Id.* at 230, 57 S.W.3d at 156.

Next, we must determine — based on the statutory requirements and the precedential framework — whether the evidence established at trial meets the requisite "substantial" threshold. According to the testimony, the genesis of this case was July 22, 2002, when S.R. was presented to the emergency room at Children's Hospital in Little Rock, Arkansas. She was accompanied by her mother and her mother's fiancé, Mark Turbyfill. One of S.R.'s attending emergency-room physicians, Dr. Valerie Borum Smith, testified that the infant had a life-threatening injury — she had a high heart rate and a low blood pressure. The child was pale and in shock due to the fact she had lost twenty-five percent of her blood supply. The infant had blood in her diaper, dried blood all over her genital area, and a large tear with a clot in her vaginal area.

---

[1] Arkansas Code Annotated § 5-14-103 was amended by Act 1469 of 2003. The crime that is the subject of this appeal took place prior to the effective date of Act 1469.

The tear was a third-degree tear, extending through the muscle all the way down to the rectal sphincter; a tear equivalent to the kind a woman would have from child birth. Dr. Smith testified that in order to have a vaginal tear of that degree, there would have to be penetration of the labia majora of the vagina. Dr. Smith further testified that S.R.'s was the worst tear she had ever seen — the child's vaginal opening had been torn to twice its normal size, and she was in danger of bleeding to death without surgical intervention. Dr. Smith also testified that the child's condition was so grave that they were unable to perform a rape kit on her for fear it would dislodge the clot and restart the bleeding.

Dr. Smith also noted that the child would have begun to bleed immediately and that the blood would have been immediately evident. She also testified that — based on the rate of blood loss — the injury occurred the same day that the child presented to the emergency room. Dr. Smith stated that she called in the attending physician, Dr. Steven Wade Shirm, to help treat the child. Dr. Smith also called Dr. Karen Kozlowski, the state's only pediatric gynecologist, to perform the complicated and painful surgical repair on the child. A social worker was also called in, based on the doctors' belief that the child had been abused. The emergency-room doctors also searched the child's body for ejaculate fluids with a fluorescent lamp but found none. Dr. Smith testified that this was possibly due to the excessive amount of blood that could have washed the fluid away. Dr. Smith stated that it was rare to find ejaculates and that penetration by a penis can occur without ejaculate being present.

Dr. Smith concluded by stating within a reasonable degree of medical certainty that the child's vaginal tear was consistent with an intentional injury, stating, "It's consistent with penetration by an object of some sort that caused this tear." She based this opinion on the fact that accidental tears (straddle injuries) are much more likely to be interior tears and they usually tear upward toward the clitoris — here the victim's tear went down, suggesting a significant amount of force penetrating her labia. Further, Dr. Smith also noted that the child was not yet walking, thus there was a low possibility for an accidental, recreation injury.

Dr. Shirm also testified at trial, and his account of events was essentially the same as Dr. Smith's. He noted that the infant's vaginal tear was by far the worst he had ever seen and stated that the injury was not consistent with an accidental injury. He further stated that the only time he had observed a tear in similar severity

was while serving on obstetric service where he saw such a tear after a woman had given childbirth without an episiotomy being performed. Dr. Shirm concluded that this injury could not have occurred without penetration to the labia majora. He stated that a blunt force caused the injury — a penis, a broom handle, or some other object.

Initially, the infant's mother reported to the physicians that she had been alone with the child all day. When Dr. Shirm told the mother and Turbyfill that the child's injury did not appear to be accidental and that the child had been intentionally assaulted, Turbyfill did not react or interact with the doctors. He merely stood in a corner. Dr. Smith testified that Turbyfill's reaction seemed odd because typically when a patient is injured to that degree, the caretakers are concerned about the child's physical state and how the injury occurred. Dr. Shirm testified that most parents in such a situation are aghast, have a terrible reaction, and are very angry. However, in this case, witnesses observed that neither Turbyfill nor the child's mother had much of a reaction to the news.

T.G. Stone of the Crimes Against Children Division of the Arkansas State Police also testified. His testimony concerned his investigation of the child's injury. Both the child's mother and Turbyfill were interviewed the same day that S.R. was taken to the hospital. In Turbyfill's first recorded statement, he claimed that the child's mother had gone to the store and left him with the child that afternoon. He admitted that the baby was crying, and he went to check on her. Finding that she had a wet diaper, he took off her diaper, picked her up out of the baby bed, and laid her on her sister's bed in the same room. He noticed blood on the baby's bottom. He wiped it up, but could not ascertain where it was coming from. He then returned to the living room to wait for the child's mother to arrive home. When asked what he thought was the cause of the blood, he guessed that he had accidentally cut the child with his fingernail when he picked her up. However, a photo was taken of Turbyfill's hands that showed his nails were short and that there was no blood under his nails. Turbyfill testified that he had to move the child from the baby bed to her sister's bed because it was too deep for him to reach her. Two days later, Trooper Stone visited the child's home. He testified that he could have changed the infant in her bed, without having to move her.

Four days later, Turbyfill gave a second statement to the authorities. Investigator Michael Connell explained that he falsely

told Turbyfill during the interview that he had conducted a rape kit on the child in hopes of prompting a confession. Turbyfill denied intentionally hurting the child. He stated that when he picked her up she was struggling and squirming, so he had to "pinch or do something of that nature" because "she was squirming real hard." As the interview progressed, Turbyfill continued to deny intentionally hurting the child. Once he said, "I did not start out to molest that child." He also stated that the mother and the three-year-old sibling were alone with the child during the two hours prior to the time he was alone with the child and that the three-year-old could have put something in the infant's diaper. At the conclusion of the interview, he admitted to only accidentally hurting the child.

■ When asked about Turbyfill's explanations of S.R.'s injury, the doctors stated that none of the scenarios could explain the level of damage the infant sustained. Turbyfill's hands were examined and Dr. Shirm noted that Turbyfill's nails were not unlike his own — short without blood underneath. Dr. Shirm noted that he had examined many children and never caused an injury from a fingernail. The doctors that testified agreed that the child could not have sustained an injury of this magnitude from a pinch, a fingernail scratch, or a three-year-old's actions. The evidence at trial established that, while in Turbyfill's exclusive care, the victim's labia majora was intentionally penetrated by blunt force — a penis, a broom handle, or some other object. This evidence, coupled with Turbyfill's improbable and inconsistent statements regarding how the infant sustained the injury, is more than sufficient to support the charge of rape. Therefore, we affirm the trial court's denial of Turbyfill's motion for directed verdict.

■■ Turbyfill also contends that the two doctors who testified at trial were not qualified to opine that S.R.'s injury was intentionally inflicted. Arkansas Rules of Evidence 702 and 703 govern the admission of testimony of expert witnesses. Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 703 states:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Jackson v. State*, 359 Ark. 297, 197 S.W.3d 468 (2004). If some reasonable basis exists demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Id.* The general test of admissibility of expert testimony is whether it will assist the trier of fact in understanding the evidence presented or determining a fact in issue. Ark. R. Evid. 702; *Arrow Int'l v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003).

Dr. Valerie Borum Smith, who was two months shy of completing her training as a pediatric specialist, was established as an expert witness based on her specialized training in detecting sexual abuse, which included attending lectures by a child-abuse expert regarding physical and sexual abuse, working with patients in the hospital's child-abuse clinic, reading on the subject, and reviewing a series of pictures and slides of children who had been injured intentionally and accidentally in order to discern the difference between accidental and intentional injuries. At the time of trial, Dr. Smith had examined between fifty and sixty children who were victims of sexual abuse, mostly females, and had observed approximately ten vaginal tears, which she described as a relatively rare injury. At the time she treated S.R., she had worked at Children's Hospital for thirteen months and had examined about 300 to 500 children (with forty indicating abuse) during her tenure at the hospital. Based on her knowledge and experience in the area of sexual abuse, Dr. Smith was willing to assert that S.R.'s injury was not sustained in an accidental fashion. Indeed, Dr. Smith's testimony supported only one finding — that the infant's injury was due to a blunt-force intentional injury.

Dr. Shirm, a pediatrician who was serving as the attending physician in the emergency room at Children's Hospital as part of his duties as a University of Arkansas for Medical Science (UAMS) faculty member also testified at trial. Dr. Shirm had served on the UAMS faculty since 1988. He was board certified in General

Pediatrics and Pediatric Emergency Medicine. He estimated that he had examined between 400 and 500 children at the hospital where the complaint was sexual abuse. Dr. Shirm also testified that he attended lectures and kept current with all literature in the area of child abuse as part of his specialty in emergency medicine. In the course of his work, Dr. Shirm had observed fifty to 100 vaginal tears. He further testified that, based on his observation and published accounts on the subject, he was able to observe distinct patterns that allow him to differentiate accidental and intentional tears. Dr. Shirm also concluded that S.R.'s injury was not consistent with an accidental injury — that there was a blunt force (a penis, broom handle, or some other object) from the outside of the infant's vagina inward that caused injury to the interior portion of the vaginal area.

Although Turbyfill does not dispute that both Dr. Smith and Dr. Shirm were qualified medical experts, he argues that their conclusions regarding the intentional nature of S.R's injury did not meet the *Daubert* test[2] because the conclusions were not based on testing or other scientific method.

In *Farm Bureau Mutual Insurance Co. v. Foote*, 341 Ark. 105, 14 S.W.3d 512 (2000), the Arkansas Supreme Court adopted the holding of the United States Supreme Court in *Daubert* and the inquiry to be conducted by a trial court. Therefore, after *Foote*, the trial judge, when presented with a proffer of expert scientific evidence, must initially perform a gatekeeping function in order to determine if the reasoning behind the evidence is scientifically valid and can be applied to the facts of the case. The supreme court set forth criteria to be used by the judge in making that decision — whether the theory can be tested, whether the theory has been subjected to peer review and publication, whether there were standards maintained controlling the tests or operation, and whether the theories have been generally accepted in the scientific community. The court later observed that the requirements of Rule 702 apply equally to all types of expert testimony and not simply to scientific expert testimony. *Coca-Cola Bottling Co. v. Gill*, 352 Ark. 240, 100 S.W.3d 715 (2003) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137

---

[2] Named for the case in which it was adopted, *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

(1999)). The supreme court added that in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant. *Id.*

However, the *Daubert* and *Kumho Tire* opinions recognize that not all expert testimony is subject to the *Daubert* analysis. The inquiry to be made by the trial court is a flexible one, not a rigid one. *Daubert*, 509 U.S. at 594–95. Further, the *Daubert* factors neither necessarily nor exclusively apply to all experts or in every case. *Kumho Tire*, 526 U.S. at 141. The law grants a trial court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination. *Id.* at 142. Moreover, the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Id.* at 150.

In the instant case, we conclude that it was not necessary for the circuit court to engage in a *Daubert* or *Kumho Tire* analysis of the particular questions relating to reliability of the doctors' conclusions regarding causation. The *Daubert* factors are simply inapplicable to this kind of testimony that is based on the experiences and the knowledge garnered by the expert. *Jackson*, 359 Ark. at 303, 197 S.W.3d at 473. The *Daubert* inquiry, which seeks to determine the dependability of an expert's methods, is of little value in the present case. As our supreme court has noted, the *Daubert* factors are applicable to "novel" scientific evidence, theory, or methodology. *Id.* at 303, 197 S.W.3d at 473. The testimony of these doctors was not novel in any respect. Instead, the testimony in this case was based on experience and observations rather than methodology. Accordingly, we are satisfied that the trial court did not abuse its discretion or fail in its gatekeeping function by allowing Dr. Smith and Dr. Shirm to opine as to the causal nature of S.R.'s injury based on their experience, knowledge, and training, which is specifically permitted under Rule 702.

Finally, Turbyfill claims that the court abused its discretion and violated *United States v. Whitted*, 11 F.3d 782 (8th Cir. 1993), by allowing the doctors to testify that sexual abuse had in fact occurred, testimony that has been classified by the courts as neither useful to the jury nor admissible. However, here, the doctors merely testified that S.R.'s injury was consistent with intentional penetration causing injury to the child as well as sexual

abuse. Existing Arkansas law allows such testimony, because although it embraces the ultimate issue, it does not mandate a legal conclusion. *Johnson v. State*, 292 Ark. 632, 732 S.W.2d 817 (1987). In sum, we find no meritorious argument in Turbyfill's appeal, and we affirm the trial court in all respects.

Affirmed.

BIRD and GRIFFEN, JJ., agree.