Louanne PARKER *v.* John Matthew PARKER

CA 06-111 248 S.W.3d 523

Court of Appeals of Arkansas
Opinion delivered January 31, 2007

[Rehearing denied March 7, 2007.]

*Rieves, Rubens, & Mayton,* by: *Kent J. Rubens* and *Lawrence W. Jackson,* for appellant.

*Mooney Law Firm, P.A.*, by: *Clarke Mixon*; and *Barrett & Deacon, A Professional Association*, by: *D.P. Marshall Jr., Brandon J. Harrison*, and *Andrew H. Dallas*, for appellee.

L ARRY D. VAUGHT, Judge. Appellant Louanne Parker appeals from an order modifying the amount of child support and alimony to be paid by her former husband, appellee John Matthew (Matt) Parker. We affirm.

In a 1999 divorce decree, Louanne was awarded custody of the parties' three children, and Matt was ordered to pay $2026 per month child support and $1600 per month alimony. During the proceedings, Louanne asked that she be allowed to relocate with the children to Little Rock, but her request was denied. Louanne continued to reside in the marital home, and, under the terms of the decree, the house was to be sold and the proceeds to be divided equally upon her vacating it. The remaining assets were divided equally for the most part, although a business venture that Matt had entered into with his brothers, Jonesboro Investment Company, LLC, was declared to be his non-marital property.

Louanne appealed from the decree, challenging the denial of her request to relocate, the division of marital property, and the calculation of Matt's income for support purposes. In *Parker v. Parker*, 75 Ark. App. 90, 55 S.W.3d 773 (2001) (*Parker I*), we affirmed the property division and support awards but reversed the prohibition on her relocation and declared that she was free to move to Little Rock.

Soon after *Parker I* was handed down, Louanne petitioned the trial court for permission to move to Texas rather than Little Rock. Matt initially opposed the petition, but the matter was settled, with Louanne and the couple's daughters relocating to Texas and the couple's son remaining in Jonesboro with Matt. The parties agreed that neither of them would seek modification of child support or alimony before February 28, 2003. Additionally, Matt agreed to pay Louanne $107,500 for her interest in the marital home.

Upon moving to Texas in 2002, Louanne purchased a home for $185,000. Even though she had recently obtained a post-graduate degree as a specialist in education from Arkansas State University in Jonesboro, she planned to pursue a PhD from the University of North Texas. When she learned that there had been changes in the department at North Texas and that the particular

degree she sought was no longer being offered, she transferred after one semester to Texas Women's University to pursue her PhD in psychology, with a minor in pediatric neuropsychology. She hoped to complete this degree by 2006. While in school, she obtained her Texas license as a specialist in school psychology. She did freelance work in 2003 and 2004, for which she received a small income.

On May 21, 2004, Matt filed a motion to modify his child-support and alimony payments. He asserted, as changed circumstances, that the couple's oldest daughter would graduate from high school on May 29, 2004, resulting in each party having custody of one minor child; that Louanne had completed her education specialist degree and had received assets in the post-decree division of marital property; and that Louanne, despite having obtained her degree, "continues to be enrolled in post-graduate education as a lifestyle choice." Louanne opposed the motion and denied that any downward adjustments in child support or alimony were warranted.

Hearings were held in September and October 2004 to determine both parties' incomes for child-support purposes and Louanne's continuing need for alimony. Particularly at issue was whether Matt's income should include a one-time, $200,000 distribution that he received from Jonesboro Investment Company, LLC, in 2004. In addition, there was evidence that, in September 2004, Louanne obtained two contracts as a licensed specialist in school psychology, which would pay her a total of $52,000 per year.

After the hearings, the trial court issued letter opinions with the following relevant rulings: 1) a change of circumstances warranted modification of child support and alimony; 2) Louanne's net income, as per her new contracts, was $809.73 per week; 3) Matt's net income was $2539.77 per week; 4) based on the parties' incomes and the chart amounts attributable to each of them having custody of one minor child, Matt's net child-support obligation was modified to $244.96 per week; 5) the $200,000 distribution to Matt from the LLC would not be included in calculating Matt's income; 6) even if the $200,000 were included, a deviation from the chart attributable to that amount was justified; 7) Louanne would receive alimony at the reduced rate of $1000 per month from January 1, 2005, through December 31, 2006, when it would cease entirely. These rulings were incorporated into an order entered July 11, 2005, from which Louanne filed a

timely notice of appeal. She now argues that the trial court erred in calculating hers and Matt's incomes for purposes of child support and that the trial court erred in reducing the amount of alimony she was to receive.

### Calculation of Income for Child-Support Purposes

We review traditional cases of equity, such as domestic-relations proceedings, de novo. *Hurtt v. Hurtt*, 93 Ark. App. 37, 216 S.W.3d 604 (2005). It is the ultimate task of the trial judge to determine the expendable income of a child-support payor. *Cole v. Cole*, 89 Ark. App. 134, 201 S.W.3d 21 (2005). As a rule, when the amount of child support is at issue, we will not reverse the trial judge absent an abuse of discretion. *Id.*

Under this heading, Louanne makes several sub-arguments, which we will address individually. We first consider her claim that the trial court's temporary child-support order entered in August 2004 incorrectly established the parties' incomes. At the hearing that preceded that order, the trial judge received evidence so that child support could be temporarily adjusted pending completion of trial. At the close of the hearing, the judge declared Matt's yearly income to be $163,448.50, based on an exhibit prepared by Louanne's expert witness, and declared Louanne's yearly income to be $19,423, based on her adjusted gross income from her 2003 tax return. Louanne now states that the trial court erred in "calculating appellant's obligation for the temporary order on her adjusted gross income as opposed to appellee's after-tax income."

Louanne's assertion on this point is made without a developed argument and without a convincing explanation as to how or why a legal error occurred. It is the appellant's burden to demonstrate reversible error. *See Arrow Int'l, Inc. v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003). Moreover, no authority, other than a general citation to Administrative Order No. 10, is cited. Points asserted without citation to authority or convincing argument should not be considered. *West v. West*, 364 Ark. 73, 216 S.W.3d 557 (2005). In any event, Matt's income at the temporary hearing was calculated by reference to an exhibit offered by Louanne, and Louanne's income was taken from her 2003 tax return, which she agreed could be used for that purpose. An appellant may not complain on appeal that the trial court erred if she induced, consented to, or acquiesced in the trial court's position. *Keathley v.*

*Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). We therefore find no reversible error on this point.

■ We next address Louanne's statement that "the court used the projected weekly wages that Ms. Parker did not begin receiving until September 30, 2004, and applied them retroactively." By "retroactively," she means, as best we can tell, that the court calculated the income that she was to receive from her September 2004 contracts "as though [she] had received that additional income throughout 2004." Again, Louanne does little more than make an assertion of this point, unsupported by convincing argument or authority. *See West, supra.* Moreover, we do not believe that the trial court's ruling bears out her argument. The final order entered July 11, 2005, retroactively modified Louanne's support payments as of September 2004, which was the month that she began earning money on her contracts. We therefore see no basis for reversal.

■ Next, in a similarly undeveloped and unsupported argument, Louanne contends that "it was error under Administrative Order No. 10 to fail to calculate Ms. Parker's income by looking at her 2002 and 2003 tax returns." She is apparently contending that she was a self-employed person and that, under Administrative Order No. 10, her child-support obligation should have been calculated based on her prior two years' tax returns and her current year's quarterly estimates. *See In re Administrative Order No. 10: Arkansas Child Support Guidelines,* § III(c) 347 Ark. App'x 1064, 1068 (2002) (per curiam). However, at the beginning of the final hearing in this matter, Louanne's counsel seemingly invited the court to look to her 2004 contracts in determining her income, stating:

> [W]e have provided and the Court will see that a contract that was not available was signed ultimately on September 2nd or 3rd. And I may be off a day. And there are actually two of them. They're for ten months each, and there's a right of renewal in favor of the employer. They each pay 26,000 dollars for ten months. And so she has income and she can — the Court can clearly look to that in terms of the youngest child, the daughter that is in Texas with Mrs. Parker.

This, therefore, seems to be a case in which the trial court did what it was asked to do. An appellant may not complain of an alleged

erroneous action of the trial court if she has consented to or acquiesced in that action. *See Keathley, supra; Harness v. Ark. Pub. Serv. Comm'n*, 60 Ark. App. 265, 962 S.W.2d 374 (1998).

 We turn now to Louanne's assertion that, in calculating Matt's income, the trial court failed to consider certain matters, including interest-free loans that Matt received from the LLC and five-percent fees or commissions that he was to receive as part of his LLC income.[1] We find no error here. There was evidence that the amount that Matt stood to gain from the fees and commissions was de minimis. As for the interest-free loans, they were, in part, a device for protection of the LLC's money. Matt (and his brothers, who also received such loans) used approximately $355,000 in loan proceeds to buy individual CDs in smaller amounts in order to obtain the FDIC's $100,000 limit; then, when the CDs matured, they placed the interest back into the LLC account — a practice that even Louanne's counsel called "good business." Other loans at issue were obtained by Matt in 2002 and 2003 for the purpose of paying off the mortgage and buying out Louanne's interest in the marital home and for the purpose of buying some stock. However, Louanne makes no convincing argument nor does she cite any authority for the proposition that the interest that Matt saved as a result of these loans should be considered income for child-support purposes. Therefore, her burden of demonstrating reversible error has not been met.

 Finally, we address Louanne's argument that Matt's income should have included a $200,000 distribution from the LLC that was reported and taxed as income in 2000 but was not actually distributed until 2004. We conclude that Louanne is procedurally barred from raising this issue. The trial court gave two alternative bases for its ruling on this point: 1) the $200,000 distribution should not be included in Matt's 2004 income because it was reported and taxed in 2000, and, alternatively 2) if it were included, a deviation from the chart for the amount of support attributable to the $200,000 would be justified. On appeal, Louanne attacks the trial court's refusal to consider the $200,000 as

---

[1] Louanne also mentions, in cataloguing the matters that the trial court did not consider, Matt's failure to list any liabilities owed to the LLC on his affidavit of financial means and the LLC's failure to keep records of its investors' capital accounts. It is not explained how the trial court's failure to consider these matters impacted the calculation of Matt's income.

part of Matt's income but not the trial court's alternative ruling that a deviation from the support chart was justified. Thus, even if we were to agree that the $200,000 should have been included in calculating Matt's income, we still would not reverse in light of the failure to attack the trial court's independent, alternative basis for its ruling. *See Morehouse v. Lawson*, 90 Ark. App. 379, 206 S.W.3d 295 (2005); *Pugh v. State*, 351 Ark. 5, 89 S.W.3d 909 (2002); *Pearrow v. Feagin*, 300 Ark. 274, 778 S.W.2d 941 (1989); *Camp v. State*, 66 Ark. App. 134, 991 S.W.2d 611 (1999).

To conclude on this point, we affirm the trial court's calculation of the parties' incomes for child-support purposes.

### Modification of Alimony

The primary factors to be considered in changing an award of alimony are the needs of one party and the ability of the other party to pay. *Bracken v. Bracken*, 302 Ark. 103, 787 S.W.2d 678 (1990). Each case is to be judged upon its own facts. *Id*. Discretion is vested in the trial judge, and we will not reverse absent an abuse of discretion. *Id*.

From 1999 through 2004, Matt paid Louanne $1600 per month as alimony. Under the trial court's current order, that amount was modified to $1000 per month from January 1, 2005, through December 31, 2006. Thereafter, the alimony obligation ceased. We cannot say that the trial court abused its discretion in making this modification.

Louanne argues that Matt's income increased following entry of the 1999 decree; however, there was evidence that her income increased as well. The court found in 1999 that Louanne earned a salary of $700 per month, but by the time the 2005 order was entered in the present case, the court found her income to be $809.73 per week. Further, Louanne earned one post-graduate degree after the 1999 alimony was established and was expected to earn a doctoral degree by the time the alimony obligation ceased in 2006. Additionally, there was evidence that Louanne was able to afford a nice residence and new automobiles and that she received at least $400,000 in assets from the property division following entry of the 1999 decree. Moreover, she is currently supporting one minor child rather than three.

While Louanne mentions other matters to support her claim for continued, unmodified alimony, we conclude, based on

the above factors and our de novo review, that the trial court did not abuse its discretion in modifying the alimony as it did. We therefore affirm on this point.

Affirmed.

PITTMAN, C.J., agrees.

GRIFFEN, J., concurs.

WENDELL L. GRIFFEN, Judge, concurring.

*Science and technology multiply around us. To an increasing extent they dictate the languages in which we speak and think. Either we use those languages, or we remain mute.*

— J.G. Ballard, British novelist

I write separately to address the glaring briefing deficiencies in this appeal and to again call for electronic filing of the record and briefs in our state. Appellant's brief consists of four volumes, including a 277-page abstract and a 684-page addendum. Substantial portions of appellant's abstract are merely a verbatim copy of the transcript rather than the impartial, first-person condensation of the testimony in this case that is required by Ark. Sup. Ct. R. 4-2(a)(5). A word-for-word transcription of the record is not an abstract under our rules. *See Muldrow v. Douglass*, 316 Ark. 86, 870 S.W.2d 736 (1994).

Our rules state that the addendum should contain those documents that are necessary for the understanding of the case and this court's jurisdiction. *See* Ark. Sup. Ct. R. 4-2(a)(8). However, appellant's addendum contains a number of records that are unnecessary in this appeal. Several documents are included in the addendum multiple times. The addendum contains correspondence between counsel and between the parties and the circuit court; that correspondence serves no useful purpose for understanding any issue raised or argument advanced in the appeal.

It is true that this case requires consideration of the financial records of the parties. Nevertheless, I see no reason why almost every financial record introduced at trial was included in the addendum. Our rules state, "In the case of lengthy pleadings or documents, only relevant excerpts in context need to be included in the Addendum." *Id.* While I recognize that attorneys often

include extra material in an exercise of caution, both parties should be reminded that "excessive abstracting is as violative of our rules as omissions of material pleadings, exhibits, and testimony." *Forrest City Mach. Works v. Mosbacher*, 312 Ark. 578, 587, 851 S.W.2d 443, 448 (1993).

The record and the briefs in this case illustrate the need to modernize appellate practice in Arkansas in light of the advantages presented by information technology. The appellate record in this case was ten volumes, totaling 1959 pages. Appellant submitted a 980-page brief. Appellee's brief, which included an unnecessary supplemental addendum, numbered 174 pages. Appellant filed an eighteen-page reply brief. If each party made twenty copies of the briefs (seventeen for filing with the clerk, one for opposing counsel, one for the circuit court, and one for that party), then the briefs and record on appeal consisted of 25,399 pieces of paper. According to an environmental company based in San Francisco, California, one tree makes 16.67 reams (one ream = 500 sheets) of paper. Conservatree, *How Much Paper Can Be Made From A Tree?*, http://www.conservatree.com/learn/EnviroIssues/Tree Stats.shtml (last visited Jan. 18, 2007). Based on these calculations, the paper filed by the parties on this appeal alone has consumed almost three trees. Of course, all the voluminous paper briefs and record must be stored someplace once they are delivered to the Justice Building in Little Rock, so some method for physically storing and retrieving them must be selected, implemented, and financed. The cost of storing and retrieving paper records and briefs must be paid from state revenue.

The costs associated with our paper method of appellate practice does not end when the record and briefs are assembled. There is the additional cost associated with transporting paper to Little Rock for filing. In the instant case, the office of counsel for appellant is in West Memphis. Appellee's counsel's office is in Jonesboro. Those offices are each approximately 120 miles from Little Rock. Our current method of appellate practice required that appellant's counsel, or someone on his behalf, travel 120 miles to pick up the voluminous record, drive 120 miles back to West Memphis to prepare the briefs, drive 120 miles to file the briefs and return the record, then drive 120 miles back home. At that point, appellee's counsel, or someone on his behalf, was forced to repeat this process. The combined approximate distance driven by or on

behalf of both attorneys to process the appeal totals 960 miles. The vehicles used for that travel may have easily consumed at least $100 worth of gasoline.

The exercise that our current system of appellate practice imposed on the parties in this appeal is repeated for every appeal taken in Arkansas. Thus, our court rules compel people to run up and down the highways, when gasoline prices are a constant concern for everyone, simply to file papers associated with appeals. We are doing this in the age of the Internet, E-Bay, electronic filing of tax returns, and electronic banking. We are requiring litigants to pack paper across Arkansas highways even as state and federal courts across the nation are increasingly using the Internet by electronic filing (called "e-filing").

E-filing will undoubtedly reduce costs to parties. E-filing eliminates the costs associated with hand delivery, messenger services, printing, photocopying, mailing, and the fuel costs associated with shipping or driving paper records and briefs from throughout Arkansas to Little Rock.

E-filing also will provide savings to our courts. Judges and their staffs will be able to retrieve electronic documents quickly and easily. Under our current paper system, the paper record is accessible only to one user at a time and in one location. Thus, anytime a lawyer, law clerk, member of the clerk's staff, or judge desires to examine the record, he or she must physically locate it, retrieve it, search it, and return it, all to the exclusion of any other potential user of the record. If Arkansas adopted an e-filing system, the record could be lodged electronically on a secure server that could be password protected so that users could access it instantly, simultaneously, and economically. Thus, Arkansas lawyers and the appellate courts would reduce paper storage costs.

I am merely advocating that we undertake reasonable steps consistent with what has already been published in legal periodicals available locally. The William H. Bowen School of Law at the University of Arkansas at Little Rock publishes *The Journal of Appellate Practice and Process* twice a year. The Fall 2005 issue includes an article by Roger Hanson of Williamsburg, Virginia that discusses the growing use of e-filing by American state appellate courts.

Arkansas is already far behind other states concerning e-filing. Since 1998, Division Two of the Arizona Court of Appeals has been involved in a clear move toward e-filing as

lawyers from the Pima County Public Defender's office and the Tucson office of the Arizona Attorney General were permitted to electronically file motions and briefs that were maintained on a server. In 2001, trial court records from Pima County Superior Court were electronically transmitted. In 2004, Division Two started accepting transcripts from court reporters electronically.

The North Carolina Supreme Court and Court of Appeals currently use e-filing. All records and briefs filed since 1999 are available on the Internet at no cost. About twenty-five percent of all briefs are filed electronically, and the figures are growing. Fourteen states and the District of Columbia use some type of e-filing. Arkansas should be among them. The Summer 2000 issue of *The Journal of Appellate Practice and Process* includes articles that review e-filing in the United States and in Alberta, Canada. I recommend taking a few minutes to read the article by Deborah Leonard Parker titled *Electronic Filing in North Carolina: Using the Internet instead of the Interstate.*

Appeals such as we have before us provide clear evidence why Arkansas appellate courts should abandon our archaic appellate practices. As Judge George Nicholson of the California Court of Appeals once observed:

> The modern appellate courthouse is haunted by anachronism. At one moment, a judge engages in electronic legal research, links with a computer in another state as easily as to one in the next office, then to a computer perhaps even in another country in search of just the right legal precedent. With just a few key strokes or mouse clicks, vast databases of stored knowledge and wisdom can be searched while the judge composes a legal opinion. The judge then slides the chair over to the other side of the desk where lies the record on appeal, a collection of bound pages of trial court transcripts and filings. The only way to search through the record for specific trial testimony, for example, is to manually locate the testimony of the appropriate witness and then read page by page until the desired testimony is found. It is as if, by sliding the chair, the judge has gone back in time to a different era. The appellate judge has one foot in the nineteenth century and the other in the twenty-first.

George Nicholson, *A Vision of the Future of Appellate Practice and Process,* 2 J. App. Prac. & Process, 231-32 (2000) (footnotes and citations omitted).

Rather than transporting or shipping a multi-volume record to Little Rock, a court reporter could simply prepare an electronic

copy of the record and lodge it on a secure server under the control of the supreme court clerk. The parties could then access that electronic record to file electronic briefs, and could do so conveniently and safely from the offices of their legal counsel without wasting time, gasoline, and money as required by our current paper process. For those attorneys and judges who somehow remain wedded to the notion that they must have paper documents at hand to function, their recourse would simply be to click on the print icon on their computer word-processing screens. Whatever the initial and ongoing costs for an e-filing system may be, one can safely predict that our state and litigants will experience substantial savings.

Since 2001, I have been advocating that Arkansas modernize appellate practice by implementing an electronic system for filing and briefing appeals. I do not understand why it makes sense for our appellate process, in which lawyers and judges no longer rely upon carbon paper, manual typewriters, and liquid paper for preparing briefs and opinions, to operate as if the Internet does not exist and word processing was science fiction. Until some type of electronic filing system is instituted, our appellate courts will continue to lag behind the rest of the country and be a living anachronism. Meanwhile, the cost that Arkansans pay to pursue paper appeals will be quite unnecessary. No matter how much time or money one may have, wisdom always counsels employing technology to save time and money when doing so will achieve the same result as employing more costly and time-consuming measures. It remains to be seen whether we will be wise or foolish in this regard.